STANLEY E. WOODWARD, JR.
Associate Attorney General
United States Department of Justice

DANIEL W. GLAD
Acting Deputy Assistant Attorney General
Antitrust Division

CHRISTOPHER J. CARLBERG
JEREMY M. GOLDSTEIN
Assistant Chiefs, San Francisco Office

ANNE VELDHUIS
Trial Attorney, San Francisco Office
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102-3478
Telephone: (415) 934-5300

ERIC GRANT
United States Attorney

DHRUV M. SHARMA
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ILYA ZAGARYUK,<br>Defendant. | CASE NO. 2:26-cr-00161-JAM<br><br>PLEA AGREEMENT<br><br>DATE: OCTOBER 27, 2026<br>TIME: 9:00 A.M.<br>COURT: Hon. JOHN A. MENDEZ |

## I. INTRODUCTION

### A. Scope of Agreement.

The Information in this case charges the defendant Ilya Zagaryuk with a violation of 18 U.S.C. § 371 – conspiracy to provide kickbacks, an offense proscribed in 41 U.S.C. §§ 8702, 8707. This document contains the complete plea agreement between the United States Department of Justice, Antitrust Division and the United States Attorney's Office for the Eastern District of California (collectively, the "government") and the defendant regarding this case. This plea agreement is limited to

the United States Department of Justice, Antitrust Division and the United States Attorney's Office for the Eastern District of California, and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

**B. Court Not a Party.**

The Court is not a party to this plea agreement. Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of the defendant, including activities which may not have been charged in the Information. The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement. The defendant understands that neither the prosecutors, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II. DEFENDANT'S OBLIGATIONS

**A. Guilty Plea.**

The defendant will plead guilty to Count 1 – participating in a conspiracy in violation of 18 U.S.C. § 371 to provide kickbacks, an offense proscribed in 41 U.S.C. §§ 8702, 8707. The defendant agrees that he is in fact guilty of that charge and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A ("Factual Basis") are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this agreement, including the factual admissions set forth in the Factual Basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f)

and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this agreement generally.

1. Waiver of Indictment:

The defendant acknowledges that under the United States Constitution he is entitled to be indicted by a grand jury on the charge to which he is pleading guilty and that pursuant to Fed. R. Crim. P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of indictment to the charge set forth in the Information. The defendant agrees that at a time set by the Court, he will sign a written waiver of prosecution by indictment and consent to proceed by information rather than by indictment.

**B. <u>Restitution.</u>**

The defendant agrees to pay restitution pursuant to 18 U.S.C. § 3663(a)(3) to the victims affected by this offense, including, but not limited to, the United States Postal Service and the victims covered in the Factual Basis, and other victims as a result of the defendant's conduct for the offense charged from the periods of May 2022 through February 2024. The amount of the defendant's restitution will be $465,347.75—jointly and severally liable with co-conspirators, if any, to the extent caused by the defendant's and any other co-conspirators' joint conduct.

The defendant agrees that all criminal monetary penalties imposed by the court, including restitution, will be due in full immediately at time of sentencing and subject to immediate enforcement by the government. The defendant agrees that any payment schedule or plan set by the court is merely a minimum and does not foreclose the United States from collecting all criminal monetary penalties at any time through all available means.

The defendant further agrees that he will not seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding.

The defendant shall not sell, encumber, transfer, convey, or otherwise dispose of any of his assets without prior written consent of the United States Attorney or a designee of the U.S. Department of Justice's Antitrust Division, except that the defendant may sell, transfer or convey personal property (including used vehicles and personal items, but not financial instruments, ownership interests in business entities or real property) with an aggregate value of less than $5,000.

Payment of restitution shall be by cashier's or certified check made payable to the Clerk of the Court.

**C. Fine.**

The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a fine, and that no fine should be imposed. The defendant understands that it is his burden to affirmatively prove that he is unable to pay a fine and agrees to provide a financial statement under penalty of perjury to the Probation Officer and the government in advance of the issuance of the draft Presentence Investigation Report, along with supporting documentation. The government retains the right to oppose the waiver of a fine. If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered by the Court, up to the statutory maximum fine for the defendant's offense.

**D. Special Assessment.**

The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing. The defendant understands that this plea agreement is voidable at the option of the government if he fails to pay the assessment prior to that hearing.

**E. Violation of Plea Agreement by Defendant/Withdrawal of Plea.**

If the defendant violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government. If the government elects to void the agreement based on the defendant's violation, the government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. A defendant violates the plea agreement by committing any crime or providing or procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct constituting obstruction of justice. Varying from stipulated Guidelines application or agreements regarding arguments as to 18 U.S.C. § 3553, as set forth in this agreement, personally or through counsel, also constitutes a violation of the plea agreement. The government also shall have the right (1) to prosecute the defendant on the count to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this

plea agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge. The decision to pursue any or all of these options is solely in the discretion of the government.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement. The determination of whether the defendant has violated the plea agreement will be under a probable cause standard.

In addition, (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Fed. R. Crim. P. 11(f), Fed. R. Evid. 410, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

**F. <u>Asset Disclosure.</u>**

The defendant agrees to make a full and complete disclosure of his assets and financial condition and will complete the United States Attorney's Office's "Authorization to Release Information" and "Financial Disclosure Statement" within three (3) weeks from the entry of the defendant's change of plea, including supporting documentation. The defendant also agrees to have the Court enter an order to that effect. The defendant understands that if he fails to complete truthfully and provide the described documentation to the United States Attorney's Office and United States Department of Justice, Antitrust

Division within the allotted time, he will be considered in violation of the agreement, and the government shall be entitled to the remedies set forth in section II.E above.

The defendant expressly authorizes the United States to immediately obtain a credit report to evaluate defendant's ability to satisfy any monetary penalty imposed by the Court. The defendant also authorizes the government to inspect and copy all financial documents and information held by the U.S. Probation Office.

**G. Agreement to Cooperate.**

The defendant agrees to cooperate fully with the government and any other federal, state, or local law enforcement agency, as directed by the government. As used in this plea agreement, "cooperation" requires the defendant: (1) to respond truthfully and completely to all questions, whether in interviews, in correspondence, telephone conversations, before a grand jury, or at any trial or other court proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the defendant's presence is requested by the government or compelled by subpoena or court order; (3) to produce voluntarily any and all documents, records, or other tangible evidence requested by the government; (4) not to participate in any criminal activity while cooperating with the government; and (5) to disclose to the government the existence and status of all money, property, or assets, of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal activities or the illegal activities of any conspirators.

## III. THE GOVERNMENT'S OBLIGATIONS

**A. Other Charges.**

The government agrees not to bring any other charges arising from the conduct outlined in the Factual Basis attached hereto as Exhibit A, except if this agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of Plea), III.B.3 (Reduction of Sentence for Cooperation), VI.B (Stipulations and Estimates Affecting Guideline Calculation), and VII.B (Waiver of Appeal and Collateral Attack) herein.

**B. Recommendations.**

1. Incarceration Range.

The government will recommend that the defendant be sentenced to the low end of the

applicable guideline range as determined by the Court.

2. Acceptance of Responsibility.

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of his offense level if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. §3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the Presentence Investigation Report, being truthful and candid with the probation officer, not committing any new violations of law, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G §3C1.1, either in the preparation of the Presentence Investigation Report or during the sentencing proceeding.

3. Reduction of Sentence for Cooperation.

The government agrees to recommend at the time of sentencing that the defendant's sentence of imprisonment be reduced by up to 50% of the applicable guideline sentence if he provides substantial assistance to the government, pursuant to U.S.S.G. §5K1.1. The defendant understands that he must comply with paragraph II.G and not violate this plea agreement as set forth in paragraph II.E herein. The defendant understands that it is within the sole and exclusive discretion of the government to determine whether the defendant has provided substantial assistance.

The defendant understands that the government may recommend a reduction in his sentence of less than 50% or no reduction at all, depending upon the level of assistance the government determines that the defendant has provided.

The defendant further understands that a motion pursuant to U.S.S.G. §5K1.1 is only a recommendation and is not binding on the Court, that this plea agreement confers no right upon the defendant to require that the government make a §5K1.1 motion, and that this plea agreement confers no remedy upon the defendant in the event that the government declines to make a §5K1.1 motion. In particular, the defendant agrees not to try to file a motion to withdraw his guilty plea based on the fact that the government decides not to recommend a sentence reduction or recommends a sentence reduction less than the defendant thinks is appropriate.

If the government determines that the defendant has provided further cooperation within one

year following sentencing, the government may move for a further reduction of his sentence pursuant to Fed. R. Crim. P. 35.

**C. <u>Use of Information for Sentencing.</u>**

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this plea agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

## IV. ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty, participating in a conspiracy in violation of 18 U.S.C. § 371 to provide kickbacks, an offense proscribed in 41 U.S.C. §§ 8702, 8707:

First, beginning at least as early as May 2022, and continuing through and around February 2024, there was an agreement between two or more persons to commit a crime against the United States, namely, to provide kickbacks, an offense proscribed in 41 U.S.C. §§ 8702, 8707;

Second, the defendant became a member of the conspiracy knowing its object and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

The elements of the offense of providing kickbacks are that:

First, the defendant was an employee or agent of a subcontractor;

Second, the defendant knowingly and willfully provided, attempted to provide, or offered to provide any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind;

Third, to an employee or agent of a prime contractor, who is a person that has entered into a prime contract with the Federal Government; and

Fourth, for the purpose of improperly obtaining or rewarding favorable treatment in

connection with a subcontract relating to a prime contract.

For the offense to which the defendant is pleading guilty, the definitions of terms such as "kickback," "subcontractor," "prime contractor," and "prime contract" are set forth in 41 U.S.C. § 8701 and incorporated herein by reference.

The defendant fully understands the nature and elements of the crime charged in the Information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V. MAXIMUM SENTENCE

### A. Maximum Penalty.

The maximum sentence that the Court can impose for conspiracy in violation of 18 U.S.C. § 371 is 5 years of incarceration, a fine of $250,000 or twice the gross pecuniary gain or twice the gross pecuniary loss resulting from the offense, a three-year period of supervised release, and a special assessment of $100. By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B. Violations of Supervised Release.

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to two additional years of imprisonment.

## VI. SENTENCING DETERMINATION

### A. Statutory Authority.

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take it into account when determining a final sentence. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines,

must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B. Stipulations and Estimates Affecting Guideline Calculation.**

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

1. Base Offense Level: 8

The parties agree that the base offense level is 8. U.S.S.G. §2B4.1(a).

2. Specific Offense Characteristics: +12

The parties agree that the value of the improper benefit to be conferred in return for the bribes (i.e., kickbacks) was at least $465,347.75 but not more than $550,000. Accordingly, the parties stipulate that the base level is increased by 12. U.S.S.G. §2B4.1(b)(1); U.S.S.G. §2B1.1(b)(1)(G); U.S.S.G. §2C1.1, Appl. Note. 3.

3. Adjusted Offense Level: 20

4. Acceptance of Responsibility: *See* paragraph III.B.2 above.

5. Adjustment for Certain Zero-Point Offenders: The parties estimate, but do not stipulate, that the defendant will qualify for a -2 adjustment under U.S.S.G. §4C1.1.

6. Criminal History: The parties estimate, but do not stipulate, that the defendant's criminal history category will be I.

7. Estimated Sentencing Range: 18-24 months in prison. (The defendant understands that if the criminal history category differs from the parties' estimate, his Guidelines sentencing range may differ from that set forth here.)

8. Other Enhancements or Reductions:

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three or Four adjustments (other than the decreases for "Acceptance of Responsibility" or "Certain Zero Point Offenders"), or cross-references, except that the government may move for an adjustment based on the defendant's cooperation (§5K1.1) or post-plea obstruction of justice (§3C1.1).

The defendant is free to make any arguments with respect to a variance from the guidelines under 18 U.S.C. § 3553(a). The government reserves its right to oppose any such variance and agrees to recommend a sentence at the low end of the applicable guideline range as determined by the Court.

## VII. WAIVERS

### A. Waiver of Constitutional Rights.

The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be compelled to incriminate himself.

### B. Waiver of Appeal and Collateral Attack.

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence. The defendant agrees as part of his plea, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum for the offense to which he is pleading guilty. The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this agreement is insufficient to support the defendant's plea of guilty. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever

attempts to vacate his plea, dismiss the underlying charge, or modify or set aside his sentence on the count to which he is pleading guilty, the government shall have the rights set forth in Section II.E herein.

**C. Waiver of Attorneys' Fees and Costs.**

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).

**D. Waiver of Venue.**

The defendant understands that as to the count charged against him, the law gives him a right to a trial in the state and district where the count was allegedly committed. To the extent it is applicable, the defendant agrees to waive this right and any and all objections as to venue for the charge filed in this case.

**E. Impact of Plea on Defendant's Immigration Status.**

The defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty. The defendant and his counsel have discussed the fact that the charge to which the defendant is pleading guilty is an aggravated felony, or a crime that is likely to be determined to be an aggravated felony under 8 U.S.C. § 1101(a)(43), and that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, it is virtually certain that defendant will be removed if he is not a citizen of the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

## VIII. ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the

government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX. APPROVALS AND SIGNATURES

### A. Defense Counsel.

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: 10/26/2026

RON HOEVET
Attorney for Defendant

### B. Defendant:

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: 10/26/2026

ILYA ZAGARYUK
Defendant

**C. Attorneys for United States:**

I accept and agree to this plea agreement on behalf of the government.

Dated: 10/26/2026

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION

CHRISTOPHER J. CARLBERG
JEREMY M. GOLDSTEIN
Assistant Chiefs
ANNE VELDHUIS
Trial Attorney

Dated: 10/26/2026

ERIC GRANT
United States Attorney

DHRUV M. SHARMA
Assistant United States Attorney

## EXHIBIT "A"

### Factual Basis for Plea

At all relevant times, the defendant, Ilya Zagaryuk, owned and operated a construction company ("Company B") based in Milwaukie, Oregon. Company B employed Zagaryuk's family member ("Individual A") as a bookkeeper who was responsible for the company's accounting.

### The Kickback Conspiracy

Beginning at least as early as May 2022, and continuing through in or around February 2024 ("the conspiracy period"), in the Eastern District of California and elsewhere, Zagaryuk was a member of a conspiracy to knowingly and willfully provide kickbacks to a prime contractor employee so that Zagaryuk's Company B received subcontracts to perform facilities repair work on United States Postal Service ("U.S.P.S.") properties. The U.S.P.S. properties where Company B performed facilities repair work included post offices, facilities used to sort mail, and other properties. Zagaryuk paid kickbacks related to Company B's facilities repair subcontracts and projects at U.S.P.S. facilities in at least Oregon, Idaho, Wyoming, Montana, and Washington state. Zagaryuk paid kickbacks in cash or through bank wire transfers to Co-Conspirator 1. Co-Conspirator 1 was an employee of Company A, a construction company in California that received prime contracts from the U.S.P.S.

When a U.S.P.S. facility needs maintenance or repair, a U.S.P.S. Facilities Engineer, who is responsible for facilities in certain states or regions, can assign a project to a contractor. For projects that are estimated to cost more than $10,000, the project should be assigned to a preapproved "Job Orders Contractor" (or "JOC"). For projects that are estimated to cost less than $10,000, a U.S.P.S. Facilities Engineer can directly select a contractor and pay that contractor with U.S.P.S. funds.

During the conspiracy period, Company A was a prime contractor providing services as a JOC. Company A employed Co-Conspirator 1, among others, to oversee construction projects, including projects Company A was assigned by the U.S.P.S. Co-Conspirator 1 told Zagaryuk that if Zagaryuk paid him kickbacks, Co-Conspirator 1 would steer more subcontracts to perform U.S.P.S. facilities repairs from Company A to Company B. At times, Zagaryuk would send Co-Conspirator 1 a draft estimate he intended to submit to Company A for a subcontract, then Co-Conspirator 1 would instruct Zagaryuk to increase the estimate and tell Zagaryuk to keep some of the extra funds and pay Co-Conspirator 1 certain amounts as a kickback. The co-conspirators intentionally inflated the estimates to build in funds for the kickbacks that were not based on legitimate repair work costs. Early in the conspiracy period, Co-Conspirator 1 determined the amount of the kickbacks Zagaryuk would pay on an ad hoc basis specific to each contract. Over time, Zagaryuk agreed to pay Co-Conspirator 1 kickbacks based on set percentages of the subcontract amount—starting with 5% and later 10%. Zagaryuk paid Co-Conspirator 1 kickbacks on U.S.P.S. facilities repair work that Company B performed both (1) as a subcontractor where Company A was the prime contractor, and (2) on projects a U.S.P.S. Facilities Engineer assigned directly to Company B, because Zagaryuk understood that Co-Conspirator 1 was steering those projects to Company B. Co-Conspirator 1 provided no substantive value to the work on subcontracts for which he received kickbacks. In a face-to-face meeting, Co-Conspirator 1 told Zagaryuk that if Zagaryuk did not make the kickback payments, Company B would no longer receive subcontracts from Company A or other U.S.P.S. work. Zagaryuk believed Co-Conspirator 1 could stop the flow of subcontracts Company B received to do U.S.P.S. work. Zagaryuk knew it was wrong and unlawful to pay kickbacks.

During the conspiracy period, Zagaryuk paid Co-Conspirator 1 at least $465,347.75 in kickbacks in connection with over 475 U.S.P.S. projects. At times, Zagaryuk paid Co-Conspirator 1 in cash, but most often Zagaryuk instructed Individual A to send wire transfer payments to Co-Conspirator 1's personal company's bank account. As examples, on or about November 13, 2023, Zagaryuk caused Individual A to send Co-Conspirator 1 $51,472.00 from Company B via wire transfer to Co-Conspirator 1's personal company's bank account, and on or about December 15, 2023, Zagaryuk caused Individual A to send Co-Conspirator 1 $41,989.00 via wire transfer to Co-Conspirator 1's personal company's

bank account. These two wire transfers represented aggregated kickback amounts Zagaryuk paid Co-Conspirator 1 related to several U.S.P.S. subcontracts and projects from around October to December 2023. During the conspiracy period, Co-Conspirator 1 resided in the Eastern District of California and, most often, communicated with Zagaryuk over the phone or through text messages.

As an example for how the conspiracy operated, on or around February 2, 2023, Zagaryuk sent by text message to Co-Conspirator 1 a two-page draft estimate from Company B addressed to Company A related to a subcontract to repair damaged walls and trim at a U.S.P.S. facility in Portland, Oregon. Company B's estimate was for a total of $29,788. Co-Conspirator 1 texted back, "Put it at 34k and change, 5k will be comms." Next, Co-Conspirator 1 wrote, "Wife wanted a new car," and sent a picture of a Maserati sports car. Zagaryuk understood that Co-Conspirator 1 had instructed him to inflate the estimate by over $4,000 that was not based on a legitimate cost of the project. He also understood Co-Conspirator 1's instruction that "5k will be comms" to mean that Zagaryuk should pay Co-Conspirator 1 a kickback of $5,000 as "comms," meaning a commission or a kickback. At other times, Co-Conspirator 1 unilaterally inflated Company B's estimates for subcontracts after Zagaryuk had submitted them to add funds for kickbacks, and then reported back to Zagaryuk the changed estimate amounts so Company B could eventually invoice for the full inflated costs. For instance, on or about November 21, 2022, Co-Conspirator 1 sent a text message to Zagaryuk stating, "Railing in Newberg will be for 12k instead of 11k. 1k this way." Zagaryuk understood this to mean that Co-Conspirator 1 had inflated Zagaryuk's estimate from $11,000 to $12,000, and Zagaryuk should pay Co-Conspirator 1 $1,000 as a kickback.

Over the course of the conspiracy, Co-Conspirator 1 at times told Zagaryuk that he needed his kickback funds wired to him urgently because he needed to pay someone else. For instance, at different times from October 2022 to December 2023, Co-Conspirator 1 sent text messages to Zagaryuk stating, "I have to pay the piper soon"; "I have to.make [sic] some payments to the boss"; "With all the issues that have come up lately I think before I call the PM I'm gonna send them some love first"; and "Ilya, need a favor on behalf of PM, she is asking for an advance of 10k, can you swing it for today? She wants me to meet her tonight." A "PM" or "Project Manager" is another name for a U.S.P.S. Facilities Engineer. From these statements and others, Zagaryuk understood Co-Conspirator 1 to be indicating that he was paying U.S.P.S. Employee 1 for the U.S.P.S. work Company B received. U.S.P.S. Employee 1 was a Facilities Engineer based in Sacramento who was responsible for assigning facilities repair projects in Oregon and elsewhere.

On or around February 1, 2024, Zagaryuk met with U.S.P.S. Employee 1 at a coffee shop in the Sacramento area. U.S.P.S. Employee 1 and Zagaryuk discussed how much money Zagaryuk was paying Co-Conspirator 1 for the work Zagaryuk's Company B received on U.S.P.S. projects. Zagaryuk suspected that U.S.P.S. Employee 1 had already known that Zagaryuk was paying Co-Conspirator 1 kickbacks. From the meeting, Zagaryuk suspected that U.S.P.S. Employee 1 and Co-Conspirator 1 had a financial arrangement. Zagaryuk thought U.S.P.S. Employee 1 was upset about the percentage Zagaryuk was paying Co-Conspirator 1 because U.S.P.S. Employee 1 may have been shorted on payments she received. Later that day, Zagaryuk met separately with Co-Conspirator 1 at a coffee shop in Roseville, California. At that meeting, Co-Conspirator 1 asked Zagaryuk to increase the kickbacks Zagaryuk was paying to Co-Conspirator 1 to 20%-25% of the cost of U.S.P.S. work from then on.

**Co-Conspirator 1's Instruction to Zagaryuk to "Wipe" His Phone and Destruction of Evidence**

On or around February 19, 2024, Co-Conspirator 1 called Zagaryuk and informed him that there was an investigation into U.S.P.S. facilities repair contracts that involved Co-Conspirator 1. Co-Conspirator 1 advised Zagaryuk not to talk to investigators and to hire an attorney. Additionally, Co-Conspirator 1 instructed Zagaryuk to "wipe" his phone. Co-Conspirator 1 told Zagaryuk that Co-Conspirator 1 had already "wiped" his own phone. Zagaryuk understood Co-Conspirator 1 to be saying that he had already deleted evidence, such as the text messages between them two. Zagaryuk did not delete his text messages with Co-Conspirator 1.

I, Ilya Zagaryuk, have read and carefully reviewed with my attorney this Factual Basis for Plea. I agree it is true and correct. I also agree that, if this matter proceeded to trial, the United States could establish each of the facts contained within this Factual Basis for Plea beyond a reasonable doubt and those facts satisfy the elements of the offense to which I am pleading guilty. Additionally, I agree this Factual Basis for Plea is a summary made for the purpose of providing the Court with a factual basis for my guilty plea and it does not include all the facts known to me concerning criminal activity in which I and others engaged.

Dated: 10/26/26

ILYA ZAGARYUK
Defendant